UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 19, 2015____
```

------------------------------------------------------X
                                              :
MANUEL DIAZ,                                  :
                                              :
                              Plaintiff,      :        14 Civ. 2277 (KPF)
                                              :
              v.                              :        OPINION AND ORDER
                                              :
CAROLYN W. COLVIN, Acting                     :
Commissioner of Social Security,              :
                                              :
                              Defendant.      :
                                              :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:[1]

Plaintiff Manuel Diaz filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision of the Acting Commissioner of Social Security (the "Commissioner") that denied Plaintiff's application for Supplemental Security Income ("SSI") based on a finding that Plaintiff was not disabled under the Act.  The parties have cross-moved for judgment on the pleadings.  Because the Commissioner's decision is supported by substantial evidence, Defendant's motion is granted, and Plaintiff's motion is denied.

---

[1]     Madeleine S. Shiff, a rising second-year student at Columbia Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

## BACKGROUND[2]

### A.    Plaintiff's Proffered Ailments

Plaintiff, born in 1969, applied for SSI in September 2010.  (SSA Rec. 77).  He alleges that he became disabled on January 1, 2000, and complains of maladies including back impairment, pain and discomfort from a rod in his left leg, human immunodeficiency virus (or "HIV"), an Achilles tendon spur, ankle arthritis, obesity, eye tearing stemming from a hole in his retina, gastroesophageal reflux disease, hyperlipidemia, and various symptoms associated with alcohol abuse.  (*Id.* at 79, 103-11, 205).[3]  At his August 6, 2012 administrative hearing, Plaintiff reported an "overall worsening of his pain condition," stemming in part from the rod in his left leg, which was inserted after his left femur was broken in 1995.  (*Id.* at 97; *see also id.* at 77, 79, 110, 242-43).[4]

Plaintiff further reported at the hearing that, at that time, his "leg and … back" were the "most limiting … as far as [his] ability to work."  (SSA Rec. 110-11).  According to Plaintiff, a combination of bulging discs and arthritis in his back allowed him to sit for "three hours until the pain start[ed]," and to stand

---

[2]    The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #8) filed by the Commissioner as part of her answer.  For convenience, Plaintiff's supporting memoranda are referred to as "Pl. Br." and "Pl. Reply," and Defendant's supporting memorandum as "Def. Br."

[3]    Plaintiff testified at his hearing that the chronic back and leg pain were the only impairments he considered severe.  Further, he stated that he did not have a drinking problem, even though the record discloses substantial evidence to the contrary.  (SSA Rec. 103-06).

[4]    The record indicates that the accident occurred in 1995, yet Plaintiff claims, without explanation, that he did not become disabled until January 1, 2000.  (SSA Rec. 77, 79).

for "forty-five minutes … at a time" prior to the onset of pain.  (*Id.* at 104-05).
Plaintiff would have to "put something hot" on his back "like the hot pad" when
the pain ensued.  (*Id.* at 105).  According to Plaintiff, the pain in his back and
left thigh occasionally woke him up at night, but only when he "forg[o]t to take
medication."  (*Id.* at 107).

Plaintiff related other symptoms that did not substantially affect his
ability to work.  (SSA Rec. 111).  For example, Plaintiff attributed occasional
fatigue and diarrhea to his HIV, but stated that he preferred to manage the
symptoms himself with "herbs and vitamins," rather than the medication
recommended by his doctors.  (*Id.* at 108, 111-12).  Plaintiff also described pain
in his right foot, which occasionally turned "black and blue" from bone spurs.
(*Id.* at 106).  He complained of eye irritation, noting that his eyes would itch
and "tear up … for no reason sometimes," although he admitted this was not a
severe impairment.  (*Id.* at 109-10).  Finally, Plaintiff complained that his
weight was a problem because he "[could not] really do anything to lose it," but
did not claim that it affected his ability to work.  (*Id.* at 108).

At the time of the August 2012 hearing, Plaintiff lived with his mother
(SSA Rec. 98).  On a typical day, Plaintiff would do "light cleaning" around the
house — as long as it did not involve strenuous bending — including taking
care of his mother's two dogs, writing and attempting to copyright music, and
cooking dinner for himself and his mother.  (*Id.* at 98-101).  When performing
household chores, Plaintiff did not need to use a cane around the house as he
"could lean against the walls" to balance himself as necessary.  (*Id.* at 106).

Plaintiff would also feed the dogs, let them out in the pen, and play with them while lying on the couch. (*Id.* at 100-01). In addition to writing songs, Plaintiff sent such songs and poems to online agencies to request feedback on his music and to seek out individuals with whom he could collaborate. (*Id.* at 99).

## B.   The Record Evidence of Plaintiff's Ailments

It is uncontested that for Plaintiff to qualify for SSI, his disability must have begun on or before September 8, 2010, the date on which Plaintiff filed his application for benefits. (SSA Rec. 92). As noted above, Plaintiff claims the onset of the disability occurred on January 1, 2000. (Pl. Br. 1). The parties agree that the relevant period for this SSI claim runs from September 8, 2010, to August 24, 2012. (*Id.*; Def. Br. 1; *see also* SSA Rec. 77, 92).

### 1.   Medical Evidence Prior to September 8, 2010

Plaintiff's first medical treatment in the record before the Court occurred on March 24, 2009, when he saw his primary care physician, Dr. Kenneth Desa, for "right ear discomfort." (SSA Rec. 309). Dr. Desa noted that Plaintiff had not sought treatment for his HIV status in the preceding six months and recommended medication. (*Id.* at 309-10). He also noted Plaintiff's alcohol consumption. (*Id.* at 309).

At the request of Dr. Desa, Dr. Gary Fink saw Plaintiff for an orthopedic evaluation of his left femur on May 4, 2009. (SSA Rec. 253). Dr. Fink noted that apart from a "couple episodes of discomfort" related to the femur injury, Plaintiff was an "otherwise healthy young man." (*Id.*). Upon examination, Dr. Fink noted that Plaintiff was "walking with two crutches but [was] able to bear

full weight." (*Id.*).  He further recorded that Plaintiff had "some restricted range of motion on the left hip ... particularly in rotation with pain over the trochanteric area,"[5] but that there was "no gross swelling in the thigh and no erythema."[6]  (*Id.*).  On Plaintiff's x-rays, Dr. Fink observed a "healed femoral fracture [with a] rod in situ," a "chronic nonunion of the greater trochanter[,]" and a fracture of the top of the rod.  (*Id.*).  Dr. Fink recommended that Plaintiff be treated with heat, the "use of a cane for a short period of time[,] and [a] short course of anti[-]inflammatories."  (*Id.* at 254).  Dr. Fink also stated that Plaintiff "may benefit at a future date from rod removal, although rod removal could be quite difficult in the face of the rod fracture."  (*Id.*).

Plaintiff visited Dr. Desa periodically, sometimes monthly, from May 2009 to the start of the relevant period in September 2010.  (*See* SSA Rec. 311-40).  During these visits, Dr. Desa reviewed Plaintiff's lab results regarding changes in his HIV status and discussed with Plaintiff his "Alcohol Abuse" and liver function test results.  (*Id.* at 311, 314, 316-17, 319, 322-24, 327, 329, 331, 334-35, 337).[7]  While noting several times Plaintiff's complaints of leg pain, apparently associated with his metal rod, Dr. Desa concluded that Plaintiff's symptoms remained consistent over time.  (*E.g., id.* at 329).

---

[5]     The trochanter is a rough area at the upper part of the femur where muscles attach. Trochanter, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/trochanter (last visited July 17, 2015).

[6]     Erythema refers to abnormal redness of the skin due to capillary congestion. Erythema, http://www.merriam-webster.com/dictionary/erythema (last visited July 17, 2015).

[7]     Among other things, Dr. Desa noted Plaintiff's refusal to attend rehabilitation sessions. (SSA Rec. 318, 335).

On December 25, 2009, after several days of complaining of pain in his abdomen, Plaintiff underwent an appendectomy at St. Luke's Hospital.  (SSA Rec. 257-69).  Plaintiff had a follow-up appointment with Dr. Desa on January 7, 2010.  (*Id.* at 324).  Upon examination, Dr. Desa wrote that Plaintiff's abdomen was "soft[,]" but did not note any issues associated with the appendectomy.  (*Id.*).  More importantly, Dr. Desa found that Plaintiff's back was "normal," his limbs were "unremarkable," and that he had a "full range of motion."  (*Id.*).  When Plaintiff complained of pain and a rash at the surgical site at his next visit on January 14, 2010, Dr. Desa ruled out an abscess and prescribed lotrisone cream.  (*Id.* at 327).[8]

Dr. Desa conducted his first assessment of Plaintiff's "ability to do work related activity" on January 7, 2010.  (SSA Rec. 345-49).  Although Dr. Desa's notes are partially obscured in the record, the parties agree that Dr. Desa wrote that Plaintiff could, in an eight-hour workday, lift and carry up to ten pounds occasionally, sit for five hours, and stand and walk for two hours each.  (*Id.* at 345-46; Pl. Br. 2-3; Def. Br. 6).

On August 5, 2010, Plaintiff went to the emergency room due to pain in his lower back.  (SSA Rec. 296-97).  During the examination, Plaintiff complained of pain on palpation of the lumbar muscles bilaterally and pain during range of motion testing.  (*Id.* at 297).  The attending physician

---

[8]     Lotrisone is an antifungal medication used to treat rashes.  Betamethasone Topical, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682799.html (last visited July 17, 2015).

diagnosed back pain,[9] for which he recommended a combination of heat and ice on the lower back three times daily and a prescription for Naproxen and Flexeril.[10] (*Id.* at 298).

Plaintiff visited Dr. John Galeno, pursuant to a referral from Dr. Desa, for physical therapy for his back on September 1, 2010. (SSA Rec. 306-08, 337). Dr. Galeno recommended a treatment plan of moist heat, electrical stimulation, ultrasound, strengthening, and exercise three times per week for six weeks. (*Id.* at 307). The record does not indicate what course of treatment, if any, Plaintiff followed.

### 2. Medical Evidence Between September 8, 2010, and August 24, 2012

#### a. Consultations in September and October 2010

The first record of medical treatment during the relevant time period occurred on September 10, 2010, when Dr. Frederick Ayers of Orange Radiology Associates reviewed an MRI of Plaintiff's lumbar spine. (SSA Rec. 353). Dr. Ayers determined that there was "no evidence of disc herniation

---

[9]     The attending physician also recommended that Plaintiff take three days off of work, which the Court understands to mean that Plaintiff was to rest for three days, as he was not employed at the time. (SSA Rec. 298).

[10]    Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by arthritis. Naproxen, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last visited July 17, 2015).

Flexeril, otherwise known as cyclobenzaprine, is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. Cyclobenzaprine, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last visited July 17, 2015).

or spinal canal stenosis" in the MRI, and noted "[d]isc bulges at L3-4 and L4-5" and "[p]ossible osteoarthritis of L3-4." (*Id.*).[11]

On September 22, 2010, Plaintiff had an appointment with Dr. Christine Kerr of Hudson River HealthCare, Inc. regarding complaints of shortness of breath after having quit smoking three weeks earlier. (SSA Rec. 338). Upon examination, Dr. Kerr determined that Plaintiff's heart and lungs were normal and his breathing rate was "regular." (*Id.*). She also determined that his gait was normal, that he had a "full range of motion" in his back and legs, and that Plaintiff experienced "no joint tenderness or swelling." (*Id.*). Regarding Plaintiff's HIV status, Dr. Kerr "discussed with patient at length" recommendations to take medication, but noted that "patient [was] highly reluctant" and preferred vitamins and "lifestyle modification" instead. (*Id.* at 338-39). Dr. Kerr further wrote about Plaintiff's episodic alcohol abuse, but noted that Plaintiff did "not want further [help] at this time." (*Id.* at 339). In addition, Dr. Kerr affirmed Dr. Ayers's finding of possible osteoarthritis in Plaintiff's back and noted Plaintiff's scheduled follow-up appointment with an orthopedist. Dr. Kerr also referred Plaintiff to a podiatrist regarding "first toe pain" with "black/blue/erythematous discoloration." (*Id.*). Finally, she recommended a follow-up visit in four weeks, which Plaintiff does not appear to have scheduled. (*Id.*).

---

[11]    References in this Opinion to "L-[number]" and "S-[number]" pertain to Plaintiff's lumbar and sacral vertebrae, respectively.

Plaintiff visited the recommended podiatrist, Dr. Robert Greco of Orange Radiology Associates, on October 19, 2010.  (SSA Rec. 354; *repeated at id.* at 355).  After taking x-rays of Plaintiff's foot, Dr. Greco diagnosed Plaintiff with a "small Achilles tendon spur" and a "tiny calcaneal spur."  (*Id.* at 354).[12]

### b.    Leena Philip, M.D

On November 10, 2010, Plaintiff underwent a consultative examination by Dr. Leena Philip, an internist at Industrial Medicine Associates, P.C.  (SSA Rec. 361-65).  Dr. Philip wrote an extensive report of Plaintiff's conditions, and this report was heavily considered by the Administrative Law Judge (the "ALJ") in this case.  (*Id.*; *see also id.* at 81).

At the appointment, Plaintiff described his "low back pain as a 1 to 2 out of 10 while sitting and a 10 out of 10 while standing."  (SSA Rec. 361).  Further, Plaintiff described the chronic pain in his left leg as a "5 to 10 out of 10," and further described the pain as "intermittent" and "sharp[,]" which "worsened with prolonged walking and lifting, and decreased with pain medications."  (*Id.*).

Plaintiff described his daily activities to Dr. Philip.  Dr. Philip noted that Plaintiff was able to "cook three times a week" and perform "light cleaning, light laundry, and light shopping once a week."  (SSA Rec. 362).  She also noted, Plaintiff "showers, bathes, and dresses daily."  (*Id.*).

---

[12]     A calcaneal spur is a heel spur, which is a calcium deposit causing a bony protrusion on the underside of the heel bone.  Glossary of Foot & Ankle Terms, American Orthopaedic Foot & Ankle Society http://www.aofas.org/footcaremd/overview/Pages/Glossary.aspx (last visited July 17, 2015).

Dr. Philip observed firsthand Plaintiff's gait, noting that he "appeared to be in no acute distress[,]" but that he was "unable to walk on heels and toes." (SSA Rec. 362).  She further indicated that Plaintiff could perform "70% of a full squat, but he need[ed] to hold onto a chair for support." (*Id.*).  Finally, Dr. Philip wrote that "in [her] opinion, the cane is not medically necessary" because Plaintiff's gait was "normal" without the cane and he did not need "help changing for [the] exam or getting on and off [the] exam table." (*Id.* at 363). During the visit, Plaintiff's musculoskeletal exam was largely normal with a slight decrease in the range of motion of the left knee.  (*Id.*).

Dr. Philip concluded her report with a "good" prognosis for Plaintiff.  (SSA Rec. 364).  She stated that in her opinion, Plaintiff had "mild limitations for prolonged standing, walking, climbing stairs, kneeling, and squatting due to left leg pain." (*Id.*).

### c.    Kenneth Desa, M.D.

The first medical record from Dr. Desa during the relevant time period is a Physical Assessment for Determination of Employability form (an "Assessment Form")[13] that Dr. Desa completed for the Orange County Department of Social Services on April 6, 2011.  (SSA Rec. 373-74).  In "Chart 1-Exertional Functions," Dr. Desa indicated that Plaintiff was able to lift 10

---

[13]    Each form contains a standardized template that allows a physician to opine on the patient's treatment history, diagnostic information, employability determinations, referral recommendations, and any other recommendations related to a possible SSI referral.  (SSA Rec. 373-74).  In the employability determination portion, checkboxes allow the doctor to indicate the patient's ability to engage in work activities, and for what length of time; a chart permits the doctor to indicate the patient's physical exertional range.

pounds, stand and walk for fewer than two hours per day, and sit for fewer

than six hours per day.  (*Id.* at 374).  Dr. Desa further checked a box indicating

that Plaintiff was capable of participating in work activities on a part-time basis

for two to four hours per day, three days per week, in a job that did not require

lifting, pulling, or pushing more than ten pounds.  (*Id.*).  Finally, Dr. Desa

stated that Plaintiff's back and leg pain constituted a "severe impairment" that

"[had] lasted, or was expected to last at least 12 months."  (*Id.*).

Dr. Desa completed another Assessment Form on January 3, 2012, in

which he opined that Plaintiff could lift ten pounds, stand for two hours, walk

for two hours, and sit for six hours in a typical eight-hour workday.  (SSA

Rec. 414-15).  He further noted that Plaintiff could work part-time for two

hours per day, five days a week.  (*Id.* at 415).  Dr. Desa again stated that

Plaintiff should be limited to a job in which he would not have to lift, pull, and

push more than ten pounds at a time.  (*Id.*).

### d.    X-Ray and MRI Results in April and June 2011

An April 27, 2011 radiology report indicated that an x-ray of Plaintiff's

lumbar spine revealed a moderate narrowing of the spinal discs between his

L3-L4, L4-L5, and L5-S1 vertebrae.  (SSA Rec. 377).  The x-ray also showed

mild stenosis[14] at L3-L4 and L4-L5; osteophyte formation[15] at L2, L3, L4, and

---

[14]    Spinal stenosis causes narrowing in the spine.  The narrowing puts pressure on nerves
and the spinal cord and can cause pain.  Spinal Stenosis, National Institutes of Health,
U.S. National Library of Medicine, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/spinalstenosis.html (last visited July 17, 2015).

[15]    An osteophyte is a bony outgrowth at a joint margin of an osteoarthritic joint, or in
degenerative disc disease.  Patient Resources-Glossary, Spondylitis Association of

11

L5; an "asymmetrical facet tropism[16]" at "L4/L5 level"; and a "completely fused transitional segment present at lumbosacral junction." (*Id.*).  An x-ray of Plaintiff's left femur and hip showed the rod, and a "possible rod fracture at the proximal end." (*Id.*).

On June 5, 2011, Dr. Prakash Patel of Orange Radiology Associates examined an MRI of Plaintiff's lumbar spine and determined that at L3-L4 there was "disc desiccation,[17] minimal endplate discogenic changes,[18] a bulging disc," as well as "left facet arthropathy."[19]  (SSA Rec. 399).  Dr. Patel also noted that at L4-L5 there was a "bulging disc without focal disc herniation or canal stenosis." (*Id.*).  Dr. Patel concluded that there was "no significant interval change" from Plaintiff's prior MRI on September 10, 2010, that Dr. Ayers reviewed.  (*Id.* at 353, 399).

---

America, http://www.spondylitis.org/patient_resources/glossary.aspx (last visited July 17, 2015).

[16]   Facet tropism is asymmetry in the facet joint angles of the lumbar and lumbosacral regions of the spine.  Facet joints are the structures that connect the vertebrae to each other.  Relationship of Facet Tropism with Degeneration and Stability of the Spinal Unit, National Institutes of Health, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2768235/ (last visited July 17, 2015).

[17]   Disc desiccation is a "common degenerative change of intervertebral discs."  Disc desiccation, UBM Medical Network, http://radiopaedia.org/articles/disc-desiccation (last visited July 17, 2015).

[18]   Discogenic endplate changes can play a role in degenerative spine disease.  Discogenic Endplate Changes, Laser Spine Institute, https://www.laserspineinstitute.com/back_problems/spinal_anatomy/endplate_changes/ (last visited July 17, 2015).

[19]   Facet joint arthropathy refers to a degenerative disease that affects the facet joints of the spine, and can cause the disintegration of cartilage on those joints.  Facet Joint Arthropathy, Laser Spine Institute, https://www.laserspineinstitute.com/back_problems/facet_disease/articles/facet_joint_arthropathy/ (last visited July 17, 2015).

### e.     Steven E. Moskowitz, D.P.M.

Podiatrist Steven Moskowitz examined Plaintiff for right foot pain on October 19 and November 9, 2011.  (SSA Rec. 378-79).  On both occasions, Dr. Moskowitz noted that Plaintiff's gait was "antalgic."[20]  At the October visit, Dr. Moskowitz diagnosed Plaintiff with "Pain In Limb," which he treated with an injection of Marcaine[21] and Vitamin B-12 around the affected site, and a prescription for Lidocaine.[22]  (*Id.* at 378).  At the November 9 follow-up appointment, Dr. Moskowitz diagnosed Plaintiff with hallux valgus (commonly known as a bunion) and anterior ankle arthritis.  (*Id.* at 379).  Dr. Moskowitz administered the same injections to the affected site, renewed the Lidocaine prescription, and applied a bunion splint to Plaintiff's foot.  (*Id.*).

### f.     Spinal injections

On February 28, 2012, as a therapeutic remedy for Plaintiff's "facet syndrome," Dr. Jeffrey Schorr, M.D., of East Coast Pain Management, P.C., administered a Xylocaine[23] injection at the L4 and L5 facets.  (SSA Rec. 380).  On April 3, 2012, Dr. Maria Rivera-Iturbe, also of East Coast Pain Management, administered a Lidocaine injection (the site of the injection is

---

[20]     An antalgic gait, otherwise known as a limp, is adopted so as to avoid pain on weight-bearing structures, and is characterized by a very short stance.  Antalgic gait, The Free Medical Dictionary, http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited July 17, 2015).

[21]     Marcaine is a local anesthetic.  Marcaine, The Free Medical Dictionary, http://medical-dictionary.thefreedictionary.com/Marcaine (last visited July 17, 2015).

[22]     Lidocaine is a local anesthetic that causes numbness and relieves pain and itching; it is prescribed as a topical solution.  Lidocaine, Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/lidocaine-topical-application-route/description/drg-20072776 (last visited July 17, 2015).

[23]     Xylocaine is as another name for Lidocaine.

13

obscured in the report).  (*Id.* at 396-98).  On May 17, 2012, Dr. Rivera-Iturbe administered a Marcaine injection at the L3 and L4 facets.  (*Id.* at 385-86).

### 3.    Medical Evidence Subsequent to the ALJ's Final Decision of August 24, 2012

Since the ALJ's decision, Plaintiff has visited several additional doctors. (*See* SSA Rec. 8-61).  On October 9, 2013, Dr. Faguna Patel of Vassar Brothers Medical Center performed a radiofrequency ablation[24] of the median branch nerves of the left L3, L4, and L5 facets of Plaintiff's spine. (*Id.* at 53-56). Further, on December 12, 2013, Plaintiff again visited Dr. Fink due to pain in his left femur.  (*Id.* at 51).  Significantly, Dr. Fink wrote, "Patient has requested some work papers be filled out.  From my standpoint there is no disability related to the femoral rodding and resulting issues with the rod.  Patient can work normally without restrictions." (*Id.*).  In December 2013, Plaintiff also sought treatment from Dr. Moskowitz for foot pain, from whom he received an injection of Marcaine to block the nerve, a prescription for orthotics, and referral for physical therapy.  (*Id.* at 14).

On January 8, 2014, Dr. Desa completed another Assessment Form for Plaintiff, which indicated a slight decline in Plaintiff's condition.  (SSA Rec. 8-9).  Dr. Desa opined that Plaintiff could lift fewer than ten pounds occasionally, stand for two hours per day, walk fewer than two hours per day, and sit for

---

[24]    Radiofrequency ablation is a procedure using radio waves or electric current to generate sufficient heat to interrupt nerve conduction on a semi-permanent basis.  It is used to treat neck and back pain stemming from facet joint problems.  Radiofrequency Ablation, MedCentral Health, http://www.medcentral.org/Main/RadiofrequencyAblation.aspx (last visited July 17, 2015).

fewer than six hours per day.  (*Id.* at 9).  In describing Plaintiff's treatment history, Dr. Desa noted that Plaintiff had "chronic back and leg pain" and was "currently awaiting surgery." (*Id.* at 8).  He then wrote that Plaintiff could not work[25] for the following three months "pending surgery" or "until cleared by surgeon." (*Id.* at 9).  Nevertheless, Dr. Desa determined that "based on the evidence available," Plaintiff did *not* have a severe impairment that "ha[d] lasted, or [wa]s expected to last at least 12 months." (*Id.*).

The following week, Plaintiff visited Dr. Louis F. Amorosa, an orthopedic surgeon, to examine his left femur with a view to determining whether surgery would alleviate his pain.  (SSA Rec. 11-12).  Dr. Amorosa listed a number of risks associated with the procedure, including possible infection or fracturing of the bone.  (*Id.* at 12).  Dr. Amorosa noted that he would be able to schedule Plaintiff's surgery if he decided to move forward with it, but neither recommended surgery nor discouraged it.  (*Id.*).

## C.    Plaintiff's Work History

Plaintiff completed his GED in 2001.  (SSA Rec. 228).  In his ALJ testimony, Plaintiff reported that he had not applied for any work for a period of years preceding the hearing, as he was either "in too much pain or … too drowsy from the medications" to do so.  (*Id.* at 99).  Plaintiff was unable to recall when he had last worked, but estimated that it was five or six years prior to his hearing when he worked as a property manager for $100 per week.  (*Id.*

---

[25]    As discussed above, because Plaintiff was not employed at the time, the Court interprets this recommendation to mean that Plaintiff should not have performed strenuous activities during the designated period.

at 101-03).  Further, in 2006, Plaintiff worked as a cashier at Macy's for "about eight months" on a seasonal basis, making "about $900 a month."  (*Id.* at 116, 118, 216, 228).

## D.    Social Security Administrative Proceedings[26]

Plaintiff filed an application for SSI on September 8, 2010, alleging disability since January 1, 2000.  (SSA Rec. 205).  Plaintiff's application was denied by the Social Security Administration on December 7, 2010.  (*Id.* at 135-38).  At Plaintiff's request, a hearing was held before ALJ Michael Stacchini on August 6, 2012, at which Plaintiff and his counsel were present.  (*Id.* at 89-121).  The ALJ conducted a *de novo* review of the record and on August 24, 2012, issued a decision finding that Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 77-84).

---

[26]    The SSA employs a five-step analysis for evaluating disability claims.  *See* 20 C.F.R. § 416.920(a)(1) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled[.]").  The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider [him per se] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (citing *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

In his decision, the ALJ first considered whether Plaintiff had been engaged in substantial gainful activity, explaining that "'[s]ubstantial work activity' is work activity that involves doing significant physical or mental activities," while "'gainful work activity' is work that is usually done for pay or profit, whether or not a profit is realized.'" (SSA Rec. 78 (citing 20 C.F.R. § 416.972(a), (b))). If an individual engages in substantial gainful activity, he is deemed not disabled. 20 C.F.R. § 416.920(a)(4)(i). The ALJ determined that Plaintiff had not been engaged in substantial gainful activity since his application date of September 8, 2010. (*Id.* at 79).

Having determined that Plaintiff was not engaged in substantial gainful activity, the ALJ proceeded to step two of the analysis. The ALJ assessed whether Plaintiff had a medically determinable impairment that was "severe" or a combination of impairments that was "severe." 20 C.F.R. 416.920(c). "An impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (SSA Rec. 78). Conversely, "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (*Id.* at 78 (citing 20 C.F.R. § 416.921 and Social Security Rulings ("SSR") 85-28, 96-3p, and 96-4p)). According to the statute, "If a claimant does not have either a severe medically determinable or combination of impairments, he is not disabled." (*Id.*).

The ALJ determined that Plaintiff had the following severe impairments since September 8, 2010: "human immunodeficiency virus, bulging lumbar discs, [r]od in left lower extremity, Achilles tendon spur, ankle arthritis, obesity, [and] facet syndrome." (SSA Rec. 79).  The ALJ found no other severe impairments; he noted that Plaintiff stated that he had a hole in his retina, but that this injury did not affect Plaintiff's ability to work.  (*Id.*).  Further, the ALJ noted that there was evidence suggestive of Plaintiff's alcohol abuse in the record, but determined that any such condition would not be considered "severe," given Plaintiff's assertion that he had largely given up drinking ten years prior.  (*Id.*).[27]

The ALJ then moved on to the third step of the analysis, to determine "whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1." (SSA Rec. 78 (citing 20 C.F.R. §§ 416.920(d), 416.925, and 416.926)).  The ALJ determined that Plaintiff did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.* at 79).  In making this determination, the

---

[27]   The ALJ also noted that there was some evidence that Plaintiff had been treated for gastroesophageal reflux disease and hyperlipidemia, but that there was "no evidence that these conditions impose[d] more than minimal limitations upon him, and consequently … must also be considered nonsevere." (SSA Rec. 79).  The record evidence of these conditions is very thin, and they were not discussed at the hearing; that the ALJ even addressed them evidences his thorough consideration of the record. (*See, e.g., id.* at 335 (noting, in July 2, 2010 medical record, Plaintiff suffered epigastric burning associated with binge drinking, but that symptoms had resolved), 322 (assessing, in October 6, 2010 medical record, Plaintiff as having hyperlipidemia, or high lipid levels in his blood, without further discussion)).

ALJ considered listings 1.02(A) (major dysfunction of a weight bearing joint) and 1.03 (reconstructive surgery or surgical arthrodesis of a major weight bearing joint) both of which involve a claimants inability to ambulate effectively.  (*Id.* at 79-80).  However, the ALJ found that Plaintiff's records did not reveal that he had "any major dysfunction of a weight bearing joint or that [he] underwent any surgery of such a joint."  (*Id.* at 80).  In fact, the ALJ noted, Dr. Philip had stated that although Plaintiff was "using a cane, his gait was normal both with and without the cane[,]" and thus there was "no evidence of an inability to ambulate."  (*Id.*).

The ALJ then proceeded to evaluate Plaintiff's residual functional capacity ("RFC").  After considering the evidence, the ALJ determined that Plaintiff:

> ha[d] the residual functional capacity to perform sedentary[28] work as defined in 20 CFR 416.967(a) except that he [could] only occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, [could] only occasionally balance, stoop, kneel, crouch, and crawl; would be limited to jobs that [could] be performed by using a handheld assistive device; would require ready access to the bathroom provided not off task more than 5% of the work day in addition to regularly scheduled breaks, and would be permitted to be off task

---

[28]   "The applicable regulations explain that 'sedentary work' involves 'lifting no more than 10 pounds at a time,' 'sitting,' and a 'certain amount of walking or standing.'  The Social Security Administration has further explained that at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."  *Penfield* v. *Colvin,* 563 F. App'x 839, 840 n.1 (2d Cir. 2014) (summary order) (citing, *inter alia, Determining Capability to Do Other Work — Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, 61 Fed. Reg. 34478, 34480 (Soc. Sec. Admin. July 2, 1996)).

19

> 5% of the work day in addition to regularly scheduled
> breaks with one unexcused absence per month.

(SSA Rec. 80).  In reaching his determination, the ALJ considered (i) "all

symptoms and the extent to which these symptoms can reasonably be accepted

as consistent with the objective medical evidence and other evidence"; and

(ii) "opinion evidence."  (*Id.* (internal citations omitted)).

Turning to the first category, in considering Plaintiff's symptoms, the ALJ

followed a two-step process.  First, he determined whether there was an

underlying impairment "that could reasonably be expected to produce the

claimant's pain or other symptoms."  (SSA Rec. 82).  Second, the ALJ evaluated

the "intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's functioning."  (*Id.*).  In

this regard, he observed that "whenever statements about the intensity,

persistence, or functionally limiting effects of pain or other symptoms are not

substantiated by objective medical evidence, the undersigned must make a

finding on the credibility of the statements based on a consideration of the

entire case record."  (*Id.*).

After careful consideration of all the evidence, the ALJ found that while

Plaintiff's medically determinable impairments could reasonably be expected to

cause the alleged symptoms, his "statements concerning the intensity,

persistence and limiting effects of these symptoms [were] not credible."  (SSA

Rec. 82).  First, the ALJ considered the medical evidence.  He acknowledged

that Plaintiff "does have some orthopedic issues" that limited his ability to

stand, walk, and lift heavy objects.  (*Id.*).  However, he found that Plaintiff was

not "altogether incapacitated," as consultative examiners found "only mild limitations" and even raised questions as to whether Plaintiff actually needed to use his cane. (*Id.*). Further, the Plaintiff had only disc bulges, not herniated discs. (*Id.*). Finally, the ALJ concluded that Plaintiff's "leg and foot problems [did] not create total instability, and at any rate should not affect [his] ability to do a sit down job." (*Id.*).

The ALJ then turned to Plaintiff's hearing testimony regarding his daily activities. The ALJ noted that Plaintiff's ability to do light cleaning, laundry, shopping, and cooking was "not suggestive of an individual whose exertional capacities [were] totally compromised." (SSA Rec. 82). Further, the ALJ determined that Plaintiff's hobbies of writing music and poetry indicated "an ability to do a sit down job and also suggest[ed] that he [was] not subject to the unrelenting pain alleged." (*Id.*). According to the ALJ, Plaintiff was able to perform sedentary work in which he could sit for a maximum of six hours, stand and work for two hours, and lift no more than ten pounds on occasion. However, Plaintiff would need to be permitted to be off-task for 5% of the workday in deference to his HIV condition. (*Id.* at 82-83). The ALJ determined that Plaintiff could work if afforded these accommodations.

Second, the ALJ found that Dr. Desa's opinion evidence, which suggested that Plaintiff's capabilities had been gradually reduced, was "not supported by any objective medical data[.]" (SSA Rec. 83). For starters, the ALJ noted that the limitations Dr. Desa ascribed to Plaintiff were inconsistent with the medical records in evidence. He further observed that Dr. Desa's "check off forms" were

21

at times internally inconsistent, insofar as they stated that Plaintiff could "sit for six hours a day, stand and walk for two, but then limited [him] to only two hours [of] work per day." (*Id.*).  As a result, the ALJ determined that he could not give Dr. Desa's statements "any more than little weight." (*Id.*).

At step four, the ALJ determined that Plaintiff could not perform past relevant work due to his injuries; indeed, the ALJ found that Plaintiff did not have verifiable past relevant work. (SSA Rec. 83).  At step five, the ALJ determined whether there was other work that Plaintiff could perform, taking into consideration his age, education, work experience, residual functional capacity, and the Medical-Vocational Guidelines.  (*Id.* (citing 20 C.F.R. § 404, Subpart P, Appendix 2)).  The ALJ noted that if Plaintiff could "perform all or substantially all of the exertional demands of a given level of exertion, the medical-vocational rules direct a conclusion of either 'disabled' or 'not disabled' depending upon the claimants vocational profile." (*Id.* (citing SSR 83-11)).  In contrast, when a claimant "cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of 'disabled' without considering the additional exertional and/or nonexertional limitations." (*Id.* (citing SSRs 83-12 and 83-14)).  The ALJ further opined that if a claimant "has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking." (*Id.* (citing SSR 85-15)).

The ALJ determined that, because Plaintiff did not have the ability to perform the full range of sedentary work, but was impeded by additional limitations, Medical-Vocational Rule 201.27 did not mandate a finding of "'not disabled.'" (SSA Rec. 83).  Thus, at the hearing, the ALJ consulted a vocational expert to determine whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity.  (*Id.* at 84).  In his opinion, the ALJ noted that the vocational expert testified that an individual with all these factors would have been able to perform the requirements of representative occupations, such as a bench assembler, which is listed as a sedentary unskilled job in the Dictionary of Occupational Titles (the "DOT") and of which there were 235,910 such jobs in the national economy and 2,800 in the regional economy.  (*Id.*).  The vocational expert further testified that Plaintiff could also work as a table worker, another unskilled sedentary position of which there were 434,170 in the national economy and 7,630 in the regional economy.  (*Id.*).  Finally, the vocational expert found that Plaintiff could work as an ampoule sealer, a sedentary unskilled job of which there were 666,860 in the national economy and 19,940 in the regional economy.  (*Id.*).

The ALJ determined that, pursuant to SSR 00-4p, the vocational expert's testimony was consistent with the information contained in the DOT.  Based on this testimony, and considering Plaintiff's circumstances and residual functional capacity, the ALJ concluded that Plaintiff was capable of making a successful adjustment to work that existed in significant numbers in the

national economy.  (SSA Rec. 83).  Because of this finding, the ALJ further
concluded that Plaintiff was "'not disabled'" under the rules.  (*Id.*).

The ALJ's decision became final on January 23, 2014, when the Appeals
Council denied Plaintiff's request for review.  (SSA Rec. 1-4).  In particular, the
Appeals Council considered the ALJ's decision and certain new evidence
presented (discussed *infra*) and determined that there was no reason to review
the ALJ's decision.  (*Id.* at 1-2).  The Council further determined that the "new
information [was] about a later time" and that it therefore did "not affect the
decision" about whether Plaintiff was "disabled beginning on or before August
24, 2012."  (*Id.* at 2).

## E.    The Instant Litigation

Plaintiff initiated this action on April 1, 2014.  (Dkt. #1-2).  The
Commissioner filed her answer and the administrative record on September 8,
2014.  (Dkt. #8-9).  The parties proceeded thereafter to file competing motions
for judgment on the pleadings: Plaintiff filed his motion on October 17, 2014
(Dkt. #12-13), in which he argued that (i) the ALJ had erred in affording Dr.
Desa's opinions "little weight"; (ii) the ALJ's credibility determination was
unsupported by substantial evidence; (iii) the ALJ relied on vocational
testimony elicited in response to an incomplete hypothetical question; and
(iv) the Appeals Council had erroneously excluded the new medical evidence.
(Pl. Br. 8-15).  The Commissioner filed her motion on November 19, 2014,
seeking affirmance.  (Dkt. #14-15).  Plaintiff filed a reply on December 2, 2014.
(Dkt. #16).

24

## DISCUSSION

**A.    Applicable Law**

### 1.    Motions Under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 548 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

## 2.      Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate his "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

In reviewing the final decision of the Social Security Administration, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard. *Selian*, 708 F.3d at 417 ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (citing *Talavera*, 697 F.3d at 151)); *see also*

26

*id.* ("If there is substantial evidence to support the determination, it must be upheld."). More than that, where the findings of the SSA are supported by substantial evidence, those findings are "conclusive." *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard." *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). To make this determination — whether the agency's finding were supported by substantial evidence — "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

## B.    The ALJ's Decision Is Supported by Substantial Evidence

Given these standards, there is no basis to overturn the Commissioner's decision. A careful review of the record confirms that the ALJ's decision was based on the correct legal standard and supported by substantial evidence.

The ALJ correctly identified the issue for his determination as whether Plaintiff was disabled under Section 1614(a)(3)(A) of the Act. The ALJ applied the correct legal standard by employing the five-step evaluation mandated

under the regulations.  *See* 20 C.F.R. § 416.920.  The ALJ conducted a

meticulous review of Plaintiff's testimony, his medical records, and the opinions

of his treating and consultative physicians.  Further, the ALJ's determination

was supported by substantial evidence, in the form of Dr. Philip's reports, Dr.

Moskowitz's examinations, Plaintiff's MRI and x-ray records, Dr. Desa's reports,

and the evidence provided regarding Plaintiff's work history and vocational

ability.  Plaintiff objects, however, that the ALJ's decision was not supported by

substantial evidence, and raises four challenges to his determinations, each of

which is discussed in turn below.

### 1.     The ALJ's Assessment of Dr. Desa's Opinion Was Supported by Substantial Evidence

First, Plaintiff contends that the ALJ improperly granted Dr. Desa's

opinion "little weight."  (Pl. Br. 8-12).  He did not.  As noted, Dr. Desa was

Plaintiff's treating physician, who provided two Assessment Forms in the

relevant time period, on April 6, 2011, and January 3, 2012.  (SSA Rec. 373-

74, 414-15).  As the ALJ noted, both Assessment Forms indicate that Plaintiff

could work part-time in a sedentary position.  (*Id.* at 80, 83).  The assessments

vary; the first relates Plaintiff's ability to lift ten pounds, stand and walk for no

more than two hours per day, sit for no more than six hours per day, and thus

work part-time for two to four hours per day three days per week.  (*Id.* at 374).

In the second examination, Dr. Desa opined that Plaintiff could lift ten pounds,

stand for two hours, walk for two hours, and sit for six hours in a typical

workday, and therefore work part-time for two hours per day five days a week.

(*Id.* at 415).[29]  The ALJ correctly noted that Dr. Desa's conclusion that Plaintiff could only do minimal part-time work was inconsistent with both his own assessments of Plaintiff's abilities on the Assessment Form and with the medical records in evidence.  (*Id.* at 83).[30]  In point of fact, although Dr. Desa indicated that Plaintiff had a "severe impairment" in the 2011 report, he did not indicate similarly in the 2012 report.  (*Id.* at 374, 415).  Therefore, even if the ALJ had granted Dr. Desa's opinions considerable authority, the opinions would not have necessitated a finding of disability for SSI purposes.

The ALJ further observed that Dr. Desa's assessments were "done in check off forms" and were "not supported by any objective medical data[,] which would account for diminution of the claimant's ability to perform sustained work activities."  (SSA Rec. 83).  Dr. Desa did not support his Assessment Forms with any clinical findings, nor did he explain his determinations.  In contrast, Dr. Philip performed a full examination of Plaintiff's abilities and determined that his cane was "not medically necessary," his gait was "normal," and that he only suffered "mild limitations" for prolonged activities such as standing or walking.  (*Id.* at 363-64).[31]  The ALJ took these

---

[29]   Dr. Desa's reports do not necessarily substantiate what Plaintiff argues to be a "diminution of the claimant's ability to perform sustained work activities."  (Pl. Br. 8). Indeed, Dr. Desa wrote in the 2012 Assessment Form that Plaintiff could work a greater number of days per week than in 2011.  (SSA Rec. 374, 415).

[30]   Plaintiff contends that Defendant's argument consists of "post-hoc rationalizations, pointing directly to the transcript for support rather than support found in the ALJ's decision."  (Pl. Reply 1).  The Court disagrees.  The ALJ sets forth the reasons for his findings in his decision.  It is helpful to look to the entirety of the record that was before the ALJ to confirm that the decision is, in fact, supported by substantial evidence, and Defendant's citations to the record aid in that evaluation.

[31]   Plaintiff argues that the ALJ based his RFC determination on his own interpretations of Plaintiff's medical records since he granted Dr. Desa's opinions "little weight" and "did

limitations into account when finding that Plaintiff had the residual functional capacity to "perform sedentary work ... using a handheld device" in which he would only occasionally have to "balance, stoop, kneel, crouch, and crawl. (*Id.* at 80).

Further, Dr. Desa's clinical findings prior to the relevant period of September 8, 2010, to August 6, 2012, do not support his work assessment. As noted above, Dr. Desa examined Plaintiff periodically from May 2009 until mid-2010. (SSA Rec. 311, 314-37). However, during these visits Dr. Desa focused on Plaintiff's alcohol abuse and various symptoms related to his HIV diagnosis, Dr. Desa never once treated Plaintiff's orthopedic symptoms as severe in nature. In fact, Dr. Desa consistently marked off "unremarkable" findings when assessing Plaintiff's "extremities." (*See, e.g.*, *id.* at 331).

Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are "not consistent with other substantial evidence in the record." *Penfield*, 563 F. App'x at 840 (internal citation and quotation marks omitted); *Lewis* v. *Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (summary order) ("With respect to [a treating physician's] opinion, the ALJ was not required to give it controlling weight where it was unsupported by the

---

not assign any weight to the internal medicine examiner Dr. Philip." (Pl. Br. 10). This statement is incorrect, however. It is clear from his decision that the ALJ considered Dr. Philip's report to be controlling and used it as a basis to contradict Dr. Desa's assessments. (SSA Rec. 81).

objective medical evidence." (internal citation omitted)).  This is precisely what the ALJ did here, and the record supports his decision to do so.  *See De La Cruz* v. *Colvin*, No. 12 Civ. 3660 (SAS), 2014 WL 2998531, at *11 (S.D.N.Y. July 3, 2014) ("[T]he ALJ did not err in placing limited weight on Dr. Tedoff's findings because they were inconsistent with the medical evidence[.]").

### 2.    The ALJ's Assessment of Plaintiff's Credibility Was Supported by Substantial Evidence

Plaintiff's second objection is that the ALJ failed to evaluate Plaintiff's credibility properly when determining his residual functional capacity.  The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations: first, the ALJ must "decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," and second, if the claimant does suffer such an impairment, "the ALJ must consider the extent to which the [claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of the record.  *Genier* v. *Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted); *see also* 20 C.F.R. § 416.929.

When a claimant alleges symptoms and a greater restriction of function than can be demonstrated by objective medical evidence alone, the ALJ considers factors including, but not limited to, the claimant's daily activities; the type, dosage, effectiveness, and side effects of medications; and other treatments or pain relief measures.  *See* 20 C.F.R. § 416.929(c).  However, "[t]he ALJ has the discretion to evaluate the credibility of a claimant and to

31

arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *McLaughlin* v. *Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980) (internal quotation marks and citation omitted).  The Court will uphold the ALJ's decision to discount a claimant's subjective complaints of pain so long as the decision is supported by substantial evidence.  *See Aponte* v. *Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  Moreover, "an ALJ's credibility determination is generally entitled to deference on appeal." *Selian*, 708 F.3d at 420; *see also Torres* v. *Colvin*, No. 12 Civ. 6527 (ALC) (SN), 2014 WL 4467805, at *4 (S.D.N.Y. Sept. 8, 2014) (collecting cases).

The ALJ gave "careful consideration" to Plaintiff's testimony from the hearing and referred to record evidence in assessing Plaintiff's credibility.  (SSA Rec. 81-82).  He found that although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (*Id.* at 82).  In particular, the ALJ noted that Plaintiff's daily activities of light cleaning, laundry, shopping, cooking, and song- and poetry- writing were "not suggestive of an individual whose exertional capacities [were] totally compromised."  (*Id.*).

The Court finds that there is substantial evidence in the record to support this conclusion.  First, Plaintiff testified that he was able to sit for three hours and stand for forty-five minutes prior to the onset of pain, which

did not indicate a constant debilitating pain.  (SSA Rec. 104).  This lack of
constant pain was further evidenced by Plaintiff's statement that the pain only
woke him up at night "occasionally," and then only when "he forg[o]t to take
medication."  (*Id.* at 107).  Further, as noted above, Plaintiff was able to
complete a wide array of household chores with only minor limitations.  (*Id.* at
98-101).  Significantly, Plaintiff testified that he did not need to use a cane
around the house as he could use the wall to "lean against" for support "as
necessary."  (*Id.* at 106).  *See Rivera* v. *Harris*, 623 F.2d 212, 216 (2d Cir. 1980)
(affirming ALJ's determination that plaintiff could perform "gainful activity of a
light, sedentary nature" where plaintiff testified that "despite her pains and
shortness of breath, she [could] cook, sew, wash and shop, so long as she did
these chores slowly and [took] an afternoon rest."); *Hamilton* v. *Colvin*, No. 10
Civ. 9641 (CM) (FM), 2013 WL 3814291, at *12 (S.D.N.Y. July 23, 2013)
(holding that the ALJ properly used Plaintiff's testimony about "cook[ing] on
her own … us[ing] public transportation," and caring for her own "personal
needs" as evidence of gainful activity).  Indeed, the ALJ noted a discrepancy
between the objective medical tests in the record and Plaintiff's testimony.  The
ALJ wrote, "the consultative examiner [Dr. Philip] found only mild limitations"
because "although the claimant ha[d] back pain[,] there [was] no evidence of
herniated discs, only disc bulges."  (SSA Rec. 82).  Further, Plaintiff's leg and
foot problems did "not create total instability," nor did they affect his "ability to
do a sit down job."  (*Id.* at 81-82).  Consequently, the ALJ properly found that

the medical records and Plaintiff's testimony suggested that Plaintiff's symptoms were not as extensive as claimed.

The ALJ also weighed Plaintiff's contradictory statements regarding his alcohol abuse in his determination of Plaintiff's credibility.  The ALJ noted that at the hearing, "the claimant … stated that he never had a drinking problem." (SSA Rec. 81).  But, both in his decision and during the hearing, the ALJ observed that there were numerous references to Plaintiff's longstanding alcohol abuse in the record.  (*Id.* at 79, 103, 317, 319, 322, 335, 339). Precisely for this reason, the ALJ cautioned Plaintiff during the hearing that he (the ALJ) was permitted to take into account Plaintiff's inconsistent statements regarding alcohol abuse in making a credibility determination, and gave Plaintiff an opportunity to explain himself.  (*Id.* at 104).  Plaintiff continued to deny abuse, in direct contradiction of the many notes of his doctors.  (*Id.*).

It is apparent that the ALJ did not disregard Plaintiff's subjective claims altogether, but reasonably regarded them with some skepticism and concluded that Plaintiff's symptoms were not present to the extent alleged during the relevant period.

### 3. Substantial Evidence Supports the ALJ's Determination That There Were a Significant Number of Jobs in the National Economy that Plaintiff Could Perform

Plaintiff argues additionally that the ALJ erred at step five in the analysis by relying on the testimony of a vocational expert, and that the vocational expert based his testimony upon an incomplete and inaccurate hypothetical question.  (Pl. Br. 13-14).  The Court disagrees.

When there is a complex vocational issue involved in determining whether an individual is disabled, the ALJ may call upon the services of a vocational expert.  *See* 20 C.F.R. § 416.966(e); *Bapp* v. *Bowen*, 802 F.2d 601, 605-6 (2d Cir. 1986).  During the hearing, the ALJ stated that Plaintiff could not "do [his] past work[,]" and therefore asked the vocational expert whether an individual with the same limitations as Plaintiff could "do other work[.]" (SSA Rec. 119).  The ALJ further noted that Plaintiff may have to use "a cane in his right hand for ambulation[,] … have ready access to a bathroom[,] … be permitted to be off task for up to 5 percent of the workday[,] … [and] take up to one unexcused or unscheduled absence a month per year." (*Id.* at 118-19).  In response, the vocational expert determined that Plaintiff could work as a bench hand, a table worker, and an ampoule sealer.  (*Id.* at 119).  *See Podolsky* v. *Colvin*, No. 12 Civ. 6544 (RA) (JLC), 2013 WL 5372536, at *17 (S.D.N.Y. Sept. 26, 2013) (holding that "while the use of a cane may impact the ability of a claimant to do *light or medium work*, there was substantial evidence in the record for the ALJ to have concluded that [plaintiff] could perform *sedentary* work with his cane" (emphases added)); *Parker* v. *Sullivan*, No. 91 Civ. 0981 (PNL), 1992 WL 77552, at *4-6 (S.D.N.Y. Apr. 8, 1992) (affirming ALJ's decision that claimant could perform sedentary work despite continued use of cane).

Plaintiff argues that the ALJ's query to the vocational expert was "incomplete" because it did not incorporate Plaintiff's own assessment and Dr. Desa's Assessment Forms.  (Pl. Br. 14).  For the reasons stated above, however, the ALJ properly determined that Plaintiff's subjective claims were

unpersuasive.  Further, even though the ALJ granted Dr. Desa's opinion "little weight," the ALJ still took it into account when determining what work accommodations to afford Plaintiff.  As a result, the vocational expert's answers were adequate to allow the ALJ to make the step-five conclusion that there was work in the national economy that Plaintiff could perform.

### 4.   Plaintiff's Proffered "New Evidence" Does Not Warrant Further Proceedings

Plaintiff lastly objects that the Appeals Council erred by not considering the "new evidence" he submitted after the ALJ's decision.  (Pl. Br. 14-15).  He states that the Appeals Council "offered no explanation as to why this new and material evidence did not warrant remand" and gave no "indication that it considered the papers at all."  (*Id.*).  First, the Appeals Council *did* consider Plaintiff's new evidence, but rejected it as a basis for reversing or modifying the ALJ's decision.  (SSA Rec. 2 ("The [ALJ] decided your case through August 24, 2012.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before August 24, 2012.")).  In any event, Plaintiff's "new evidence" does not merit a remand.

The Act sets a stringent standard for remanding based on new evidence alone: "The court … may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]"  42 U.S.C. § 405(g).  Evidence is "new" if it is "not merely cumulative of what is already in the record."  *Harris-Batten* v. *Comm'r of Soc. Sec.*, No. 05 Civ. 7188 (KMK)(LMS),

2012 WL 414292, at *6 (S.D.N.Y. Feb. 9, 2012) (citing *Lisa* v. *Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)).  New evidence is "material" if (i) it is "relevant to the claimant's condition during the time period for which benefits were denied"; (ii) it is "probative"; and (iii) there is "a reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently." *Pollard* v. *Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (quotation marks and alterations omitted).

The evidence submitted includes doctor's visits and treatment plans only from the period following the ALJ's decision.  (*See* SSA Rec. 8-61).  Further, Plaintiff's "new evidence" is merely cumulative of what was already on the record before the ALJ; while Dr. Desa's later assessment was less optimistic about Plaintiff's abilities, neither he nor any of the other treating physicians identified any new limitations or diseases.  In fact, Dr. Fink stated that in his opinion, Plaintiff had "no disability related to the femoral rodding and resulting issues with the rod."  (*Id.* at 51).  *See Harris-Batten*, 2012 WL 414292, at *6 ("Notably, however, the new evidence offers nothing by way of a more serious diagnosis related to Plaintiff's pain and bleeding, i.e., no new limitations or diseases are identified."); *Rodriguez ex rel. Mena* v. *Astrue*, No. 10 Civ. 305 (PKC), 2011 WL 2923861, at *13 (S.D.N.Y. July 7, 2011) (declining to remand case because additional medical evaluations did not "suggest that [claimant] has experienced any additional symptoms or conditions that are not already described in the record").

Next, none of these reports — which were prepared well after the time period during which Plaintiff was seeking disability benefits — provides any "new information about Plaintiff's medical condition or ability to work during the time period for which he sought benefits." *Harris-Batten*, 2012 WL 414292, at *6 (collecting cases rejecting post-hoc reports).  Indeed, the medical evidence closest in time is dated eight months after the ALJ's decision was made.  (SSA Rec. 59-60 (Dr. Desa's Assessment Form from April 10, 2013)).  The Appeals Council correctly noted that if Plaintiff wanted them to "consider whether [he was] disabled after August 24, 2012, [he would] need to apply again."  (*Id.* at 2). In light of the foregoing, the Appeals Council properly determined that Plaintiff's "new evidence" would not have altered the ALJ's decision.

Having reviewed the entire record, the Court finds that the Commissioner's decision to deny Plaintiff's application for SSI is free from legal error and supported by substantial evidence in the record.  Accordingly, there is no reason for it to be overturned.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed;

Defendant's motion for judgment on the pleadings is GRANTED; and Plaintiff's

motion for judgment on the pleadings is DENIED.  The Clerk of Court is

directed to terminate all pending motions, adjourn all remaining dates, and

close this case.

SO ORDERED.

Dated:      July 19, 2015
            New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge